## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NANCY LANE | ) | CIVIL ACTION NO. 3:15-62 |
| | ) | |
| Plaintiff, | ) | JUDGE KIM R. GIBSON |
| | ) | |
| v. | ) | |
| | ) | |
| FOREVER OF PA, INC. | ) | |
| | ) | |
| Defendant. | ) | |

### Memorandum Opinion and Order

#### I.    Introduction

Presently before this Court is Plaintiff's Motion to Dismiss Counts 1-6 of Defendant's

Counterclaims. ECF No. 14. Defendant opposes the motion. ECF No. 29. For the reasons that

follow, the Court will grant in part and deny in part Plaintiff's Motion to Dismiss Counts 1-6 of

Defendant's Counterclaims.

#### II.    Jurisdiction

The Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331.

The Court has supplemental jurisdiction over Plaintiff's state law claims arising under the

PHRA and Pennsylvania public policy pursuant to 28 U.S.C. § 1367.  The Court exercises

supplemental jurisdiction over Defendant's state law counterclaims pursuant to 28 U.S.C. §

1367(a), because the counterclaims are based on the same facts as those underlying Plaintiff's

federal claims. Venue is proper under 28 U.S.C. § 1391(b).

III.    **Factual Background**

The Court accepts the following allegations from the Defendant's Answer and Counter-Claims as true for the sole purposes of deciding the pending motion.

Defendant operates a commercial radio company. <u>ECF No. 7 at ¶ 36</u>. Defendant hired Plaintiff as an announcer and assigned her to work as an on-air personality for the morning drive radio program on station WFGI-FM ("Froggy 95"). <u>Id. at ¶ 38-39</u>. Defendant assigned Plaintiff the moniker "Daisy," and developed an on-air persona for Plaintiff related to Froggy programming and public relations events. <u>Id. at ¶ 39</u>. Defendant also assigned Plaintiff to do on-air voice-tracking on another one of its stations, WRKW ("Rocky 99"), where Defendant assigned to Plaintiff the moniker "Lexi," through which Defendant developed Plaintiff's Rocky on-air persona. <u>Id. at ¶ 40</u>.

On or about June 29, 2013, Plaintiff left work upon learning that her house had burned down and did not return to work until July 3, 2013. Defendant paid Plaintiff for this time away from work. <u>Id. at ¶ 43</u>. When she returned to work, Plaintiff told her co-workers that her then-husband had burned the house down. <u>Id. at ¶ 44</u>. Defendant thereafter started a collection among its employees to help defray Plaintiff's financial loss caused by the fire. <u>Id. at ¶ 45</u>. Plaintiff at one point, and against company policy, solicited personal financial contributions from her radio listeners to help cover her home fire losses. At this time, Terry Deitz, Defendant's General Manager, reminded Plaintiff that such solicitation was inappropriate. Deitz did not, however, take disciplinary action against Plaintiff at this time. <u>Id. at ¶ 46</u>.

Within days of returning to work after the house fire, Plaintiff told numerous co-workers, including Deitz, that she was leaving her husband. Plaintiff's daily complaints about continuing problems with her husband were consuming and disruptive at Defendant's place of business. Despite the increased levels of disruption that Plaintiff created at Defendant's workplace, Defendant elected not to take disciplinary action against Plaintiff at this time. *Id.* at ¶ 48.

In July 2013, emails from fictitious accounts to Plaintiff were anonymously posted on Defendant's social media initiatives. Around this time, Defendant's employees began to be harassed with similar emails. *Id.* at ¶ 49. Shortly thereafter, Plaintiff's car was vandalized and Plaintiff told her co-workers that her husband was responsible for the vandalism. *Id.* at ¶ 52. This vandalism fueled Defendant's employees' concerns for their personal safety, because this incident changed the situation from a domestic problem to a personal problem for employees who were concerned that Plaintiff's ex-husband would come after his wife at work where they could be caught up in any violent altercation that might take place between them. *Id.* at ¶ 53.

Defendant's employees' fears worsened when Defendant's vehicles were vandalized; numerous employees expressed fear not only that their vehicles would be vandalized but also for their personal safety. *Id.* at ¶ 55. At this time, Defendant took multiple steps to protect its employees, including: (i) changing Plaintiff's shift to take away the immediate threat of her walking from her car to Defendant's building alone in the dark; (ii) installing closed circuit surveillance cameras outside of the building; (iii) making arrangements with the local police department to have a patrol in the vicinity, if feasible, when the morning-drive program staffs

came into the building; (iv) developing and implementing a security plan that included locking the front and rear doors of the building, except for the door to the administrative area; (v) putting in place an emergency plan to handle the situation if Plaintiff's husband were to enter Defendant's building, and showing staff members a picture of Plaintiff's husband to ensure they would recognize him from a distance as part of this plan; and (vi) continuing to make security adjustments, including giving all employees keys to the building's main entrance, implementing additional shift changes to ensure that no one was scheduled to come into work alone, and implementing a "buddy" system requiring all morning-drive program employees to come in from their vehicles in pairs. *Id.* at ¶ 56. Deitz spoke to Plaintiff on January 22, 2014, and explained that Plaintiff's personal affairs were causing a distraction to the business and creating fear among employees. He stated that further station involvement in her personal affairs would result in disciplinary action. *Id.* at ¶ 59.

On Friday, January 31, 2014, Deitz received a telephone call from Plaintiff. Plaintiff stated that the District Attorney ("**D.A.**") had called her and said that they had received notice from a prison inmate that Plaintiff's husband was offering to pay people to cause physical harm to Plaintiff and her boss. *Id.* at ¶ 60. Deitz immediately called an Assistant District Attorney ("**A.D.A.**"), who confirmed to him what Plaintiff had said and also informed him that the D.A.'s office had reason to believe that both he and Plaintiff could be in mortal danger, because the information they received from the inmate was that Plaintiff's husband was offering to pay people to murder Plaintiff and him. The A.D.A. suggested that it would be best if he and Plaintiff left the area for the weekend. *Id.* at ¶ 62.

Immediately following this call, Deitz took the following steps to ensure Plaintiff's safety: (i) Deitz arranged to have Plaintiff, who was working a scheduled site appearance in Indiana, Pennsylvania, relieved from her job duties, so that she could leave the area as soon as practicable; (ii) to facilitate Plaintiff's exit from the area, Deitz sent two employees to the Indiana site, one as a replacement for Plaintiff and the other to drive Plaintiff back to the station to get her vehicle; and (iii) Plaintiff was placed on paid leave of absence until further notice pending review of the situation by Defendant. _Id._ at ¶ 62.

Before leaving the Johnstown area for the weekend, Deitz advised subordinate staff members of the situation and instructed them concerning a number of tasks to be accomplished to protect the staff and facility. Defendant put the following additional safety measures into place: (i) the local police department was notified of the situation, and a request was made that the police be watchful of Defendant's facility; (ii) new locks were installed around the Defendant's building; (iii) new dead bolt locks were installed on the building's back door; (iv) lights in the building were lit at all times; and (v) all staff members were required to come and go in pairs, and through the front doors only. _Id._ at ¶ 64.

On Monday, February 3, 2014, when Deitz returned to his office, members of the staff were talking about what had happened, speculating about what might happen, and asking questions. Members of the staff made statements indicating that they did not feel safe coming to work. _Id._ at ¶ 66.

Later in the day on February 3, 2014, Defendant reviewed the facts surrounding Plaintiff's employment and determined, in the best interest of the safety of its employees in the

Johnstown Market Area, that Plaintiff's employment should be terminated. In reaching this determination, Defendant considered that: (i) Defendant is legally obligated to provide a safe workplace for all of its employees; (ii) Deitz' life remained in imminent danger as a consequence of Plaintiff's continued employment relationship with Defendant; (iii) Plaintiff's employment relationship with Defendant placed Defendant's other employees at risk of imminent serious bodily injury or death if someone engaged by Plaintiff's husband made an attempt on the life of either Plaintiff or Deitz while either was at the workplace; and (iv) Plaintiff's employment relationship with Defendant caused, and continued to cause, Defendant's employees to be harassed and to be made to fear for their personal safety. *Id.* at ¶ 67.

Almost immediately after meeting with Deitz on February 4, 2014, and leaving Defendant's administrative offices, Plaintiff began improperly using Defendant's moniker, "Daisy," in a way intended to publicly denigrate Defendant and Defendant's management. *Id.* at ¶¶ 67-78, 71. Plaintiff participated in an interview that was televised on WJAC-TV, Johnstown, on the same day that she was notified of her employment termination. Additionally, on or about that same day, Plaintiff established a Facebook page entitled, "Justice for Nancy—Daisy," from which she urged her Facebook followers to sign an online petition on her behalf. *Id* at ¶ 72. During Plaintiff's WJAC-TV interview, Plaintiff portrayed Defendant and its management as a "cowardly" employer that failed to provide continued employment to her when she was in need. *Id.* at ¶ 73.

Plaintiff continues to post on her "Justice for Nancy—Daisy" Facebook page. Plaintiff's November 30, 2014, post reads, in part, "It is still hard to believe some days that it was taken

from me because a bully *scared a major corporation and made them cower* in their multi-million dollar pants enough to take the job of a hard working single mother of 3…Part of me wishes…that *instead of cowering* from one very stupid man who landed state time from his actions that *Forever Broadcasting would have stood beside me* in taking legal action *and demonstrated genuine care in their employees.*" <u>Id.</u> at ¶ 74. Plaintiff indicated that within days of posting this petition, she had received nearly 20,000 signatures. Plaintiff continued to urge negativity and vitriol toward Defendant and its management. <u>Id.</u> at ¶ 75. For example, Plaintiff posted, "I was fired from my job at Forever Broadcasting…A large amount of employers would rather choose to terminate the abused rather than support them. I am one of those victims…We have to rally against this together…Tell Forever Broadcasting to rethink its decision and apologize." <u>Id.</u> at ¶ 76.

Many of the individuals who saw Plaintiff's media presentations, read the follow-up stories online, followed Plaintiff's Facebook page, or saw Plaintiff's online petition, fully accepted Plaintiff's characterizations of Defendant and its management. For example, readers sent messages to Defendant which read, "I can understand why you refused to comment to the news people; you are cowards!" and "Don't you think this was a cowardly way out?" <u>Id.</u> at ¶ 78. Other individuals also accepted Plaintiff's characterizations of Defendant and its management which resulted in a reduction in Defendant's listening audiences, boycotts against Defendant and its advertisers, and a loss of advertisers, as reflected by the following sampling of comments, which were taken from Plaintiff's Facebook page and correspondence sent directly to Defendant: (i) "Froggy 98.1 Forever Broadcasting should be ashamed!!! I will not

listen to them anymore!!!!!"; (ii) "I will be BOYCOTTING FOREVER BROADCASTING & THEIR SPONSORS."; (iii) "And I will be sure to mention to your sponsors why I no longer buy from them"; (iv) "I will also contact your sponsors and let them know my money will not go to businesses that support unethical conduct toward women."; (v) "I was just reviewing advertising packages I received from a Forever Broadcasting account executive last week. I was considering purchasing the $600 package and gradually do more advertising on more stations throughout the next year. Unfortunately, I cannot support a business who doesn't value their employees' needs and best interests. I will not support your station or do any type of advertising with you in the future unless you fix your mistake…"; and (vi) "My company will not be doing business with them." *Id.* at ¶ 79.

Plaintiff also purposefully caused direct disruptions to Defendant's business operations and interfered with Defendant's business relationships with its listening audiences and the general public. Plaintiff implored her "Justice for Nancy—Daisy" Facebook page followers with the following appeal to disrupt Defendant's business operations: "Froggy 95 is back up on Facebook, shall we shut them down again?" *Id.* at ¶ 80.

Plaintiff commenced the instant action on March 10, 2015, asserting claims for Gender Discrimination, in violation of Title VII of the Civil Rights Act of 1964, violation of the Pennsylvania Human Relations Act, and Wrongful Discharge, in violation of the public policy of the Commonwealth of Pennsylvania. ECF No. 1. Defendant filed a motion to dismiss Count III of the Complaint, for Wrongful Discharge, which this Court granted on December 30, 2015. ECF Nos. 5, 37. Defendant filed an Answer and Counterclaims on May 14, 2015, asserting

counterclaims for Defamation (Counterclaim I), False Light Invasion of Privacy (Counterclaim II), Business Disparagement (Counterclaim III), Misappropriation of Proprietary Property (Counterclaim IV), and Tortious Interference with Prospective and Current Business Relationships (Counterclaims V and VI). ECF No. 7. Plaintiff moved to dismiss all of Defendants counterclaims on June 3, 2015. ECF No. 14.

## IV.    Legal Standard

Plaintiff has moved to dismiss Counts I—VI of Defendant's Answer and Counterclaims. A pleading that states a claim for relief must contain a short and plain statement of the grounds for the court's jurisdiction, a short and plain statement of the claim showing that the pleader is entitled to relief, and a demand for the relief sought. Fed. R. Civ. P. 8(a). A party may ask that a claim for relief be dismissed for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6).

In determining the sufficiency of the claim for relief, a district court must conduct a two-part analysis. First, the court should separate the factual and legal elements of a claim. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). The court must accept all of the well-pleaded facts as true, but may disregard legal conclusions. Threadbare recitals of the cause of action do not suffice. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Second, the court must determine whether the factual matters averred are sufficient to show that the claimant has a "plausible claim for relief." *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679). The claimant need not include "detailed factual allegations." *Phillips v. Cnty. Of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The court must construe the

alleged facts, and draw all inferences gleaned therefrom, in the light most favorable to the non-moving party. *See id.* at 233 (quoting *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)). In determining whether a claimant has shown a "plausible claim for relief," the court must conduct a "context specific" inquiry that requires it to "draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

If a claim is vulnerable to dismissal under Rule 12(b)(6), the district court must permit a curative amendment, irrespective of whether the claimant seeks leave to amend, unless such amendment would be inequitable or futile. *Phillips*, 515 F.3d at 236; *see also Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir. 2000) ("[L]eave to amend must be granted unless the amendment would not cure the deficiency.").

## V.    Discussion

Plaintiff seeks dismissal of Defendant's counterclaims—which assert claims for defamation, false light invasion of privacy, business disparagement, misappropriation of proprietary property, tortious interference with prospective business relationships, and tortious interference with business relationships. For the reasons set forth below, the Court denies Plaintiff's motion to dismiss with respect to Defendant's counterclaims for defamation, false light invasion of privacy, business disparagement, and tortious interference with existing and prospective business relationships. The Court grants Plaintiff's motion with respect to Defendant's counterclaim for misappropriation of proprietary property.

10

### a. Defendant's counterclaims

Defendant asserts six counterclaims against Plaintiff. First, Defendant asserts the counterclaim of Defamation. In support of this counterclaim, Defendant alleges that Plaintiff repeatedly published statements contending that Defendant and its management cowered from Plaintiff's husband and acted cowardly in the performance of their duties as corporate managers. ECF No. 7 at ¶ 82. Defendant alleges that said statements were patently false and disparaging, as neither Defendant nor its management cowered in the face of their management responsibilities, as Plaintiff contended. To the contrary, Defendant alleges, acting through its management, Defendant acted reasonably and rationally and made sound business decisions that were in the best safety interest of Defendant's employees when faced with the intrusiveness, threats, and actual imminent dangers presented by Plaintiff's husband. Id. at ¶¶ 83-84. Defendant alleges that Plaintiff's false and disparaging statements contending that Defendant and its management cowered from Plaintiff's husband and acted cowardly in the performance of their duties as corporate managers attacked the business reputations of Defendant's management, and thus constitute defamation per se. Id. at ¶ 85. Defendant alleges that as a direct and proximate result of Plaintiff's defamatory statements, Defendant's management sustained loss of personal and business reputations, which caused Defendant's management to suffer emotional distress, anxiety, humiliation, and inconvenience. Id. at ¶ 86.

Second, Defendant asserts the counterclaim of false light invasion of privacy. In support of this counterclaim, Defendant alleges that Plaintiff had direct knowledge that her statements were false and disparaging and placed Defendant in a false light. Defendant alleges that

Plaintiff was present in Defendant's workplace to observe safety measures Defendant took, and that Plaintiff had discussions with Defendant's management about the intrusiveness, threat, and danger presented by her husband and the safety measures Defendant had taken. *Id.* at ¶ 88. Defendant alleges that the false and disparaging statements which Plaintiff published would be highly offensive to a reasonable person similarly characterized. *Id.* at ¶ 89. Defendant alleges that Plaintiff acted with malice and with reckless disregard as to the falsity of her statements about Defendant and its management. In support of this allegation, Defendant asserts that Plaintiff's acts of publishing the false and disparaging statements were intentional, Plaintiff had direct knowledge of the falsity of the statements, and Plaintiff repeatedly publicized these statements despite knowing that they were false and despite the fact that she was positioned to observe the negative reactions these statements generated toward Defendant and its management. *Id.* at ¶ 90. Defendant alleges that as a direct and proximate result of Plaintiff's publications of false and disparaging statements, Defendant's management was placed in a false light and sustained losses of personal and business reputations, which in turn caused Defendant's management to suffer emotional distress, anxiety, humiliation, and inconvenience. Defendant alleges that, in addition, Plaintiff's conduct induced third parties not to deal with Defendant and its management. *Id.* at ¶ 91.

Third, Defendant asserts the counterclaim of business disparagement. In support of this counterclaim, Defendant asserts that Plaintiff's patently false and disparaging statements played a substantial role in inducing others not to deal with Defendant and its management. *Id.* at ¶ 93. Defendant alleges that as a direct and proximate result of Plaintiff's statements,

Defendant sustained a loss of value to its public image and to its brands, specifically "Forever," "Forever Broadcasting," "Froggy," "Froggy 95," "Rocky," and "Rocky 99." Defendant alleges that Plaintiff's statements caused a loss of business reputation which caused emotional distress, anxiety, humiliation, and inconvenience and that in addition, Plaintiff's conduct induced third parties not to do business with Defendant and its management. _Id._ at ¶ 94.

Fourth, Defendant asserts the counterclaim of misappropriation of proprietary property. In support of this counterclaim, Defendant asserts that, in establishing and maintaining her "Justice for Nancy—Daisy" Facebook page, Plaintiff misappropriated and misused Defendant's valuable proprietary property, including the monikers, "Daisy" and "Lexi," which were assigned to Plaintiff, uniquely and proprietarily, when she was hired as an on-air personality with radio broadcast assignments on WFGI-FM ("Froggy 95") and WRKW ("Rocky 99"), to be used solely in conjunction with her work-related duties for Defendant. Defendant alleges that it conceived, designed, developed, and preserved these monikers to develop Plaintiff's on-air personae, which Defendant offered for marketing and promotional purposes. _Id._ at ¶ 96. Defendant alleges that as a direct and proximate result of Plaintiff's misappropriation and misuse of Defendant's proprietary property, Defendant and its managers sustained loss of value to the monikers, Defendant's public image and its brands, and personal and business relations. This, Defendant alleges, in turn caused emotional distress, anxiety, humiliation, and inconvenience. Defendant also alleges that Plaintiff's conduct induced third parties not to deal with Defendant and its management. _Id._ at ¶ 97.

Fifth, Defendant asserts the counterclaim of tortious interference with prospective business relationships. In support of this counterclaim, Defendant alleges that Plaintiff was aware that Defendant utilizes and relies on its ratio station websites as vehicles through which it initiates, fosters, and maintains communications between itself and its current listening audiences, potential listeners, current and potential advertisers, and the general public. _Id. at ¶ 99_. Defendant alleges that Plaintiff knowingly and willfully attempted to disrupt Defendant's business communications channels when she appealed her "Justice for Nancy—Daisy" Facebook page followers to shut down the Froggy 95 Facebook page. _Id. at ¶ 100_.Defendant alleges further that Plaintiff's appeal to her Facebook followers resulted in significant interference with Defendant's business relationships, as it inspired her Facebook followers to respond with a sudden inundation of Defendant's Froggy 95 Facebook page and its Rocky 99 Facebook page. Defendant alleges that as a result of the character and nature of these postings, Defendant was forced to shut down its Facebook pages for three days, thereby losing a vital business communications link. _Id. at ¶ 101_. Defendant alleges that Plaintiff's conduct intentionally caused members of Defendant's listening audience who, but for Plaintiff's conduct, would have continued as members of Defendant's listening audience, to boycott Defendant's radio stations and to encourage others to do the same. _Id. at ¶ 102_. Defendant alleges that Plaintiff's statements were false and disparaging and caused prospective advertisers not to enter into business relationships with Defendant. _Id. at ¶ 103_. Defendant alleges that as a direct and proximate result of Plaintiff's publications, Defendant and its management sustained interference with its business operations and a resulting loss of value to Defendant's public

image and brands. Defendant alleges that Plaintiff's conduct also induced third parties not to deal with Defendant and its management. *Id.* at ¶ 104.

Sixth, Defendant asserts the counterclaim of tortious interference with business relations. In support of this counterclaim, Defendant alleges that as the direct and proximate result of Plaintiff's publications of false and disparaging statements, Defendant and its management sustained interference with its business operations which resulted in a loss of value to Defendant's public image and to its brands. Defendant alleges that Plaintiff's conduct also induced third parties not to deal with Defendant and its management. *Id.* at ¶ 106.

### b. Analysis

Plaintiff moves to dismiss with prejudice each of Defendant's counterclaims for failure to state a claim pursuant to FRCP 12(b)(6). ECF No. 14. For the reasons set forth below, the Court denies this motion with respects to Defendant's counterclaims for defamation, false light invasion of privacy, business disparagement, and tortious interference with existing and prospective business relations. The Court grants the motion with respect to Defendant's counterclaim for misappropriation of proprietary property.

### i. Defamation

Plaintiff makes two main arguments in support of her motion to dismiss Defendant's first counterclaim for defamation: (i) the claim is time-barred; and (ii) Defendant has failed to state the defamatory nature of Plaintiff's communications. For the reasons set forth below, the Court denies Plaintiff's motion to dismiss with respect to Defendant's counterclaim for defamation.

15

Pennsylvania has established a one-year statute of limitations for claims sounding in defamation. *Ghrist v. CBS Broadcasting, Inc.*, 40 F.Supp.3d 623, 627 (W.D.Pa. 2014) (citing 42 PA. CONS. STAT. ANN § 5523(1)). Therefore, in Pennsylvania, claims for defamation must be brought within one year of the date of publication. *Id*. Plaintiff argues that Defendant's counterclaim for defamation is time-barred. Plaintiff argues that Defendant makes only two allegations in which Plaintiff published statements indicating that Defendant acted in a cowardly manner. ECF No. 17 at 5 (citing ECF No. 7 ¶¶ 73, 74). Plaintiff argues that, since the averment in Paragraph 73 of the Defendant's Answer and Counterclaims referenced an interview that was conducted on the same day Plaintiff was notified of her termination, and because Plaintiff was notified of her termination on February 4, 2014, the averment in Paragraph 73 is time-barred, since Defendant did not file this counterclaim until May 14, 2015. ECF No. 17 at 5. Defendant does not dispute that the statements that Plaintiff made on her TV interview on February 4, 2014, are time-barred. ECF No. 29 at 6. Defendant argues, however, that Plaintiff's actionable conduct continued at least through the date of Defendant's filing of its Answer and Counterclaims on May 14, 2015. *Id.* at 6.

Reading the allegations in the Defendant's Answer and Counterclaims in the light most favorable to Defendant, the Court concludes that Defendant's counterclaim for defamation is not barred by the Pennsylvania statute of limitations. The Court finds that it is undisputed that the comments Plaintiff made during her February 4, 2014 TV interview are time-barred and thus concludes that any comments made during this interview are not actionable under a theory of defamation. However, the Defendant's Answer and Counterclaims includes

allegations of other instances of potentially defamatory statements made by Plaintiff that are not barred by the one-year statute of limitations. *See* ECF No. 7 at ¶¶ 74, 82. The Court therefore declines to dismiss Defendant's counterclaim for defamation based on Plaintiff's statute of limitations defense.

"Under Pennsylvania law, a defamatory statement is one that tends to so harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia*, 898 F.2d 914, 923 (3d Cir. 1990) (internal quotations omitted). It is for the court to determine, when examining the statement in context, whether the statement at issue is "capable of defamatory meaning." *Id*. If the court decides that it is capable of such meaning, the jury then decides whether the statement actually was so understood by the readers or listeners. *Id*. In making its determination, the court must give the words the same meaning that other people are likely to attribute to them. *Id*. "Opinion that fails to imply the underlying defamatory facts cannot support the cause of action." *Id*. However, statements of opinion may be actionable under Pennsylvania law if the allegedly defamed party establishes that the opinion may reasonably be understood to imply the existence of undisclosed facts that justify the opinion. *Meade v. Anderson*, 1999 U.S. Dist. LEXIS 731, at *6 (E.D.Pa. Jan. 28, 1999) (citing *Baker v. Lafayette College*, 516 Pa. 291, 532 A.2d 399, 402 (Pa. 1987).

To establish a defamation claim under Pennsylvania law sufficient to survive a motion to dismiss, the plaintiff must allege the following elements: (i) the defamatory character of the communication; (ii) its publication by the defendant; (iii) its application to the plaintiff; (iv) an

understanding by the reader or listener of its defamatory meaning; (v) an understanding by the reader or listener of an intent by the defendant that the statement refers to the plaintiff; (vi) special harm resulting to the plaintiff from its publication; and (vii) abuse of a conditionally privileged position. *Ashton v. Knepp*, 2014 WL 38845117, at *22 (M.D.Pa. Aug. 5, 2014) (citing PA. C.S. § 8343(a)). At issue on this motion to dismiss is whether Defendant has established element one—the defamatory character of the communication at issue. Plaintiff argues that Defendant failed to state the defamatory nature of Plaintiff's communications in that Plaintiff's comment that Defendant "cowered" is "pure opinion" and is therefore not actionable under a theory of defamation. In addition, Plaintiff argues that Defendant cannot deny the truth of Plaintiff's other statements regarding Defendant terminating Plaintiff from employment due to her ex-husband's bullying actions. *Id.* at 7-8.

Reading the allegations in Defendant's Answer and Counterclaims in the light most favorable to Defendant, the Court cannot conclude as a matter of law that Plaintiff's statements are not of a defamatory character. Defendant alleges that Plaintiff's Facebook post of November 30, 2014, read, "It is still hard for me to believe some days that it was taken from me because a bully scared a major corporation and made them cower in their multi-million dollar pants enough to take the job of a hard working single mother of 3…Part of me wishes…that instead of cowering from one very stupid man who landed state time from his actions that Forever Broadcasting would have stood beside me in taking legal action and demonstrated genuine care in their employees." ECF No. 7 at ¶ 74 (emphasis omitted). Further, Defendant alleges that "Plaintiff repeatedly published statements contending that Defendant and its management

18

cowered from Plaintiff's husband and acted cowardly in the performance of their duties as

corporate managers." ECF No. 7 at ¶ 82. The Court concludes that Defendant has alleged that

Plaintiff's statements that Defendant acted in a "cowardly" manner are of a defamatory

character, sufficient to survive a motion to dismiss, because these statements may reasonably be

understood to imply the existence of undisclosed defamatory facts that justify that opinions

contained therein. *See Meade*, 1999 U.S. Dist. LEXIS 731, at *6. While the Plaintiff correctly asserts

that portions of the statements at issue are true on their face, the Court holds that, at this stage,

this defense is unavailing, because the overall implication of Plaintiff's November 30, 2014,

statement is that Defendant terminated Plaintiff without making any attempt to help her

through her ordeal. Reading Plaintiff's statement in context, and accepting Defendant's well-

pleaded facts as true, the Court concludes that the Defendant has adequately alleged that

Plaintiff's statements are defamatory in that they are allegedly harmful to Defendant's

reputation and allegedly deterred third parties from associating or dealing with Defendant. *See*

*Elia v. Erie Ins. Exchange*, 634 A.2d 657, 660 (Pa. Super. 1993).

 For the foregoing reasons, the Court denies Plaintiff's motion to dismiss with respect to

Defendant's counterclaim for defamation.

### ii. False light invasion of privacy

 Plaintiff argues that Defendant's counterclaim for false light invasion of privacy should

be dismissed for two reasons: (i) the counterclaim is time-barred; and (ii) Defendant failed to

state a claim that Plaintiff placed Defendant in a false light and had knowledge or acted in a

reckless disregard to the falsity of the publicized matter and the false light in which Defendant would be placed.

Under Pennsylvania law, claims for false light invasion of privacy are subject to a one-year statute of limitations. *See Burger v. Blair Medical Associates, Inc.*, 964 A.2d 374, 379 (Pa. 2009). Plaintiff argues that the averments related to Plaintiff's February 4, 2014, TV interview are time-barred, as they were published more than one year before Defendant filed its Answer and Counterclaims on May 14, 2015. ECF No. 17 at 8-9. Noting that Defendant does not appear to dispute that the statements related to the February 4, 2014, interview are time-barred, the Court concludes that these allegations are barred by the one-year statute of limitations. *See* ECF No. 7 at ¶ 73. For the same reasons as stated in the defamation analysis above, however, the Court concludes that Defendant has made other allegations in its Answer and Counterclaims such that the Court declines to dismiss its claim for false light invasion of privacy based on Plaintiff's statute of limitations defense.

Pennsylvania recognizes the tort of false light invasion of privacy as defined by the Restatement (Second) of Torts: "'One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.'" *Krajewski v. Gusoff*, 53 A.3d 793, 805-06 (Pa. Super. Ct. 2012) (quoting RESTATEMENT (SECOND) TORTS, § 652E).

At issue here is the threshold question of whether Plaintiff placed Defendant in a false light, and the second question of whether Plaintiff had knowledge of or acted in reckless disregard as to the falsity of the publicized matter at issue. Plaintiff argues that Defendant's counterclaim for false light invasion of privacy should be dismissed because Defendant failed to allege (i) that Plaintiff placed Defendant in a "false light," or (ii) that Plaintiff "had knowledge or acted in a reckless disregard to the falsity of the publicized matter and the false light" in which Defendant would be placed. ECF No. 17 at 9-14. In support of this argument, Plaintiff notes that Defendant admitted that it terminated Plaintiff and that her termination was related directly to her husband's bullying and abusive behavior. *Id*. at 9-10. In the alternative, Plaintiff argues that, even if Plaintiff's communications placed Defendant in a false light, Defendant did not state that Plaintiff either knew of or acted with reckless disregard to the falsity of the publicized matter because it "has not and cannot aver that [Plaintiff] had any **knowledge** that Defendant invoked" safety measures. Plaintiff argues that there are only three safety precautions taken by Defendant of which Defendant avers that Plaintiff had actual knowledge—when Defendant relieved Plaintiff of her job duties, when Defendant provided Plaintiff with transportation to the station, and when Defendant placed Plaintiff on a paid leave of absence. *Id*. at 11-13. Lastly, Plaintiff argues that Plaintiff referred to her ex-husband as a "bully," who "landed state time" due to his actions and against whom legal action needed to be taken. Because of these statements, Plaintiff argues that Defendant's suggestion that Plaintiff acted with "reckless disregard" by omitting the threat her husband posed is "patently false." *Id*. at 14.

21

The Court concludes that Defendant adequately alleged both that Plaintiff placed Defendant in a false light and that Plaintiff had knowledge of the falsity of the publicized matter sufficient to survive the instant motion to dismiss. While it is true that Defendant admits that it terminated Plaintiff because of Plaintiff's ex-husband's actions and their impact on Defendant's place of business, it does not follow that Plaintiff's statements do not put Defendant in a false light. As noted above, while the portions of Plaintiff's statements that indicate the reasoning for her termination may literally be true, the overall implication of Plaintiff's statements is that Defendant took little or no concern over her domestic violence ordeal and instead acted in a cowardly manner by failing to help her or demonstrate care in her situation. *See* ECF No. 7 at ¶ 74.

Turning to Plaintiff's alternative argument, the Court concludes that Defendant adequately alleged that Plaintiff had knowledge of the falsity of her statements when she made them. Defendant alleged that it started a collection among its employees to help Plaintiff defray the financial loss caused by her house fire, changed Plaintiff's shift to take away the threat of her walking to work from her car alone in the dark, installed surveillance cameras, made arrangements to have police patrol in the vicinity of its place of business at certain times of day, developed and implemented a security plan, put in place an emergency plan, and made other security adjustments. ECF No. 7 at ¶¶ 45, 56. While it is arguable that certain of these security measures were taken unbeknownst to Plaintiff, the Court, drawing on its common sense and drawing all reasonable inferences from the facts as alleged in the light most favorable to Defendant, finds that these facts support the conclusion that Plaintiff was aware of the many

22

security measures taken by Defendant prior to her termination. *See Phillips*, 515 F.3d at 231. The Court finds further that Defendant alleged sufficient facts to establish on a motion to dismiss that Plaintiff publicized her statements with the knowledge that the overall implication of these statements—that Defendant did nothing to help her through her situation—placed Defendant in a false light.

Reading the allegations in the Answer and Counterclaims in the light most favorable to Defendant, therefore, the Court concludes that Defendant has stated a claim for false light invasion of privacy and thus denies Plaintiff's motion to dismiss that counterclaim.

### iii. Business disparagement

Plaintiff argues that Defendant's counterclaim for business disparagement should be dismissed for two main reasons: (i) the counterclaim is time-barred; and (ii) Defendant failed to state a claim that Plaintiff made a false statement.

Under Pennsylvania law, "the publication of a disparaging statement concerning the business of another is actionable where: (1) the statement is false; (2) the publisher either intends the publication to cause pecuniary loss or reasonably should recognize that the publication will result in pecuniary loss; (3) pecuniary loss does in fact result; and (4) the publisher either knows that the statement is false or acts in reckless disregard of its truth or falsity. *Pro Golf Mfg., Inc. v. Tribune Review Newspaper Co.*, 809 A.2d 243, 246 (Pa. 2002) (citing RESTATEMENT (SECOND) OF TORTS § 623(A) (1977)). Claims for business disparagement are subject to a one-year statute of limitations. *Id.* at 247.

23

Plaintiff argues that Defendant asserted its counterclaim for business disparagement outside of the one-year statute of limitations for such a claim. In support, Plaintiff notes that the only averments in Defendant's Answer and Counterclaims which state that Plaintiff published a comment specifically about Defendant are found in Paragraphs 73, 74, and 76. For the same reasons as stated in the counterclaims above, Plaintiff argues that this counterclaim should be dismissed as time-barred. ECF No. 17 at 15.

Noting that Defendant does not appear to dispute that the statements related to the February 4, 2014, interview are time-barred, the Court concludes that these allegations are barred by the one-year statute of limitations. *See* ECF No. 7 at ¶ 73. For the same reasons as stated in the defamation and false light invasion of privacy analyses above, however, the Court concludes that Defendant has made other allegations in its Answer and Counterclaims such that the Court declines to dismiss its claim for business disparagement based on Plaintiff's statute of limitations defense.

Plaintiff argues that Defendant relied only on "bald conclusions" to support its claim that Plaintiff made a false statement in support of its business disparagement counterclaim. *Id.* Plaintiff asserts that Defendant failed to allege that any part of Plaintiff's statements were actually false. *Id.* at 16. Further, Plaintiff asserts that Defendant "has not and cannot aver" that the statements which are not time-barred on the face of the Answer and Counterclaims are false. *Id.* Lastly, Plaintiff argues that the statements contained in Paragraph 74 of Defendant's Answer and Counterclaims are true and that Plaintiff's statement that Defendant "cowered" is an

opinion and therefore cannot satisfy the false statement requirement of a claim for business disparagement. *Id.* at 17-18.

As discussed above, the Court concludes that, even if Plaintiff's statements are literally true, reading the Answer and Counterclaims in the light most favorable to Defendant, Defendant has adequately alleged that the overall implication of Plaintiff's statements was false. Having found Plaintiff's arguments unavailing, the Court concludes that Defendant has stated a claim for business disparagement. The Court denies Plaintiff's motion with regard to this counterclaim.

### iv. Misappropriation of proprietary property

To establish a cause of action for misappropriation of proprietary property, a claimant must allege: (i) the existence of a trade secret; (ii) communication of the trade secret pursuant to a confidential relationship; (iii) use of the trade secret in violation of that confidence; and (iv) harm to the claimant. *Applied Technology Intern., Ltd. V. Goldstein,* 2004 WL 2360388, at *4-5 (E.D Pa. Oct. 20, 2004) (citing *Moore v. Kulicke & Soffa Indus., Inc.,* 318 F.3d 561, 566 (3d Cir. 2003)) (dismissing Plaintiffs' claim for misappropriation of proprietary information). Because the facts that Defendant alleges in support of this counterclaim fail to state a cause of action for misappropriation of proprietary property under Pennsylvania law, the Court grants Plaintiff's motion to dismiss this counterclaim.

Plaintiff argues that Defendant's counterclaim for misappropriation of proprietary property should be dismissed because Defendant has failed to allege that the "Daisy" moniker is proprietary or a trade secret. Plaintiff argues that Defendant's allegations indicate that there

was nothing secret about the "Daisy" moniker because it was used on air and for public relations events. ECF No. 17 at 19. Defendant argues that these monikers are its proprietary property and that Plaintiff's use of them caused them to lose value, and caused a loss of value to Defendant's public image and to its brand and personal and business relations. ECF No. 29 at 14-15.

Defendant's allegations fail to state a claim for misappropriation of proprietary information under Pennsylvania law. Defendant concedes that its monikers are not trade secrets, but argues that this cause of action should nevertheless go forward on the basis of the monikers' proprietary value to Defendant. ECF No. 29 at 14-15. Defendant fails to cite to, and the Court is unaware of, a single authority that would support this theory of liability. Indeed, courts applying Pennsylvania law that have addressed a claim labeled as "Misappropriation of Proprietary Information," appear to routinely construe such a claim as requiring a threshold showing of the existence of a trade secret. *See Parexel Intern. Corp. v. Feliciano*, 2008 WL 2704569, at *5-6 (E.D.Pa. July 3, 2008) (requiring evidence that the purportedly misappropriated information met applicable standards for confidential and/or trade secret information at the summary judgment stage on a claim for misappropriation of proprietary information), *Carescience, Inc. v. Panto*, 2003 WL 22266101, at *2 (Pa. Com. Pl. 2003) (stating that plaintiff was "apparently…trying to plead" a cause of action for misappropriation of trade secrets where the claim was labeled "Misappropriation of Proprietary Information.").

Because Defendant has failed to allege the existence of a trade secret or of any confidential information, the Court will dismiss Defendant's counterclaim for misappropriation of proprietary information.

### v. Tortious interference with existing and prospective business relationships

To state a claim for tortious interference with existing or prospective business relationships under Pennsylvania law, a plaintiff must allege: (i) an existing or prospective contractual relationship between the claimant and a third party; (ii) intent to harm the claimant by interfering with the existing relationship, or the intent to harm the claimant by preventing the relation from occurring; (iii) the absence of privilege or justification for such interference; and (iv) actual harm or damage to claimant as a result of such conduct. *Famology.com, Inc. v. Perot Systems Corp.*, 158 F.Supp.2d 589, 592 (E.D.Pa. 2001) (citing *Thompson Coal Co. v. Pike Coal Co.*, 488 Pa. 198, 208, 412 A.2d 466 (1979)).

Under Pennsylvania law, prospective business relations are "something less than a contractual right, [but] something more than a mere hope." *Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 1015 (3d Cir. 1994) (quoting *Glenn v. Point Park College*, 441 Pa. 474, 272 A.2d 895, 898-99 (Pa. 1971)). Where a plaintiff claims interference with prospective contractual relations, he must allege facts giving rise to an "objectively reasonable probability" that such a contract would arise from the parties' current dealings. *Alvard-Polk*, 37 F.3d at 1015; *Schulman v. J.P. Morgan Inv. Mgmt.*, 35 F.3d 799, 808 (3d Cir. 1994). The pleadings must identify specific business relationships suffering as the result of the alleged interference. *Brunson Communs. Inc. v. Arbitron, Inc.*, 239 F.Supp.2d 550, 578 (E.D.Pa. 2002).

Plaintiff argues that Defendant's counterclaim for tortious interference with existing and prospective business relationships must be dismissed because Defendant (i) failed to plead the existence of a contract between Defendant and a third party, and (ii) made merely "bald conclusions" regarding the falsity of Plaintiff's statements and failed to identify a false statement that Plaintiff communicated. ECF No. 17 at 20-22.

The Court concludes that Defendant has alleged facts sufficient at this stage to state a claim for tortious interference with existing business relationships and a claim for tortious interference with prospective business relationships. Defendant alleges that Plaintiff instructed her Facebook page followers to "shut down" the Froggy 95 Facebook page, which Defendant uses and relies on to initiate, foster, and maintain communications between itself and current and potential advertisers. ECF No. 7 at ¶¶ 80, 99. Further, Defendant alleges that Plaintiff willfully attempted to disrupt these "vital business communication channels" and that Plaintiff was aware that Defendant used its Facebook page to communicate with its current and potential advertisers. ECF No. 7 at ¶¶ 77, 80, 99-101, 106. Finally, Defendant alleges that Plaintiff's conduct harmed Defendant by causing third parties, including advertisers, not to deal with Defendant. ECF No. 7 at ¶¶ 76, 79, 102-05. Assuming the truth of these facts as alleged and drawing all reasonable inferences in favor of Defendant, the Court concludes that the Complaint states a claim for tortious interference with existing and potential business relations. The Court thus denies Plaintiff's motion as to Counts V and VI of the Complaint.

### c. Leave to amend

Rule 15(a)(2) of the Federal Rules of Civil Procedure provides that the court "should freely give leave [to amend] when justice so requires." "[A] district court has discretion to deny a request to amend if it is apparent from the record that (1) the moving party has demonstrated undue delay, bad faith or dilatory motives, (2) the amendment would be futile, or (3) the amendment would prejudice the other party." *Frasier v. Nationwide Mut. Ins. Co.*, 352 F.3d 107, 116 (3d Cir. 2003), *as amended* (Jan. 20, 2004) (citing *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002)).

The Court finds no reason to deny leave to amend in this case. Defendant is granted leave to amend Counterclaim IV of the Answer and Counterclaims.

## VI. Conclusion

For the foregoing reasons, the Court holds that Defendant failed to plead sufficient facts to establish its counterclaim for Misappropriation of Proprietary Property. The Court therefore grants Plaintiff's motion with respect to Counterclaim IV. The Court holds further that Defendant pled sufficient facts to establish its counterclaims for Defamation, False Light Invasion of Privacy, Business Disparagement, Tortious Interference with Prospective Business Relationships, and Tortious Interference with Business Relationships. The Court therefore denies Plaintiff's motion with respect to Counterclaims I, II, III, V, and VI.

An appropriate order follows.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

NANCY LANE                      )
                                )        CIVIL ACTION NO. 3:15-62
                    Plaintiff,  )
                                )        JUDGE KIM R. GIBSON
        v.                      )
                                )
FOREVER OF PA, INC.             )
                                )
                    Defendant.  )

## ORDER

**AND NOW,** this 30th day of December, 2015, upon consideration of Plaintiff's Motion to Dismiss Counts 1-6 of Defendant's Counterclaims (ECF No. 14) and brief in support thereof (ECF No. 17), Defendant's response in opposition thereto (ECF No. 29), Plaintiff's Reply Brief (ECF No. 32), and Defendant's Sur-Reply Brief (ECF No. 35-1), and in accordance with the foregoing Memorandum Opinion, it is **HEREBY ORDERED** that the Motion to Dismiss is **GRANTED in part and DENIED in part**, as set forth in the Memorandum Opinion. Defendant is granted twenty-one (21) days from the date of entry of this Order to amend Counterclaim IV.

BY THE COURT:

KIM R. GIBSON

UNITED STATES DISTRICT JUDGE